Irvin, survivor, &c. *vs.* The Sea Insurance Company.

Where, in an action on a *policy of insurance* for the loss of a ship, it appeared that at the time of the application for the insurance, a *representation* was made that *no spirits would be allowed on board*, and it turned out in proof that the master of the vessel had in the cabin *two kegs of spirits*, containing four or five gallons each, which would have belonged to him as a perquisite on his arrival at the port of destination, but which were not broached or any of the contents used on board of the vessel, it was held, that the spirits not being on board *for use*, and *not being in fact used*, the policy was not invalidated.

It was further held, that the *representation* would not prevent the taking on board a whole cargo of spirits, if taken for *transportation* in the regular course of business.

Error from the supreme court. The plaintiff brought an action in the superior court of the city of New York on a policy of insurance on the British ship *Priscilla* at and from Liverpool to the port of St. Johns, New Brunswick. The vessel was wrecked and totally lost. At the time that the policy was effected, the plaintiffs represented the Priscilla to be a new ship perfectly sound in every respect, and would in every respect bear a comparison with any vessel ever built in New Brunswick ; and further, " the captain, is a careful " and steady man, has good officers and crew ; *and no spirits* " *allowed on board.*" Evidence was given in reference to the character and seaworthiness of the vessel, which, however, it is not necessary to advert to. In respect to the *prohibition of spirits*, it was proved by the master of the vessel that a keg of *brandy* and a keg of *gin*, each containing about four or five gallons, were taken on board at *Liverpool* among the ship's stores ; the kegs were sealed with the king's seals, and the seals were not broken, nor were any of the contents drawn out or used after the kegs were taken on board : and that on his arrival at *St. Johns*, the liquor would have belonged to him as a perquisite. On his cross-examination, he stated that when he sailed from Liverpool, he had on board about a pint of spirits in a third keg ; that the kegs were stowed in the cabin ; that they were not entered in the bill of lading ; that they came on board out of bond—a drawback being allowed at Liverpool.

Irvin v. Sea Ins. Co.

He admitted that he had been informed by the owners of the vessel that the insurance company refused to pay on account of his carrying spirits, and being a drunkard ; that they told him they had desired him not to carry liquors and that he ought not to have done it.  That he thereupon procured certificates from merchants of *Liverpool* and *St. John* that he was a sober man, and not addicted to drinking, which he gave to the owners, who said they would send them on to New-York.  The chief justice of the superior court, in reference to the *prohibition of spirits*, charged the jury : that the fair construction of the contract in that respect was, *that spirits were not to be allowed on board for use,* nor to be *in fact used,* and if therefore the spirits were taken on board for *cargo* or *transportation* merely, and not for the purpose of being used or consumed on board, and if in truth no part thereof was used on board during the voyage, the fact that it was on board would not vitiate the policy.  The chief justice also charged the jury on the subjects of the character of the vessel and its seaworthiness.  To which charge, the counsel for the defendants excepted.  The jury found for the plaintiff, and judgment was accordingly entered.  The defendants sued out a writ of error removing the record into the supreme court, where the judgment of the court below was *reversed.*  The plaintiff thereupon removed the record into this court.

The judgment of the court below was reversed in the supreme court, on the ground of the *misdirection of the jury* in respect to the prohibition of spirits ; the opinion was delivered by Mr. Justice COWEN, the portion whereof relating to this subject is in these words :

" The representation ' no spirits allowed on board,' was in substance an assurance that the vessel should maintain the character of a *temperance ship.*  Spirits were taken into the cabin as part of her stores, not expressly to be used, and none of them were in fact used ; but, according to what was customary at Liverpool, they were embarked for transportation as a perquisite of the captain, to be sold by him on his own account.  Not being on the bill of lading, they

were subject, however, to be diposed of or used by him, or converted by him to the purpose of treating the crew. The charge was, that spirits might be taken for cargo or transportation merely ; and, if not to be used, nor in fact used, the purpose of the representation was fulfilled.

It is not easy, I suspect, to maintain this part of the charge in its full latitude. It might be to strong to say of a representation couched in language like this, that spirits should not be transported by way of regular cargo, entered on the bill of lading, with its three parts in different hands, for the purpose of detecting any fraudulent conversion. Even that might be unjust to the insurers. But to allow the carrying of liquor by the master or crew, under pretence of venture or perquisite, would be, in effect, to render the representation a very idle promise. Even a personal engagement not to drink, made by landmen, under every possible inducement to fulfil it——motives of health, reputation, fortune, the encouragement of friends and the influence of example, is but too often found to be a slender tie, when opposed to the force of opportunity, exerted upon an appetite in the least vitiated by habit. Sailors, beside being remarkable for general improvidence, are among the last who would even form resolutions of abstinence; they are far removed from many of the ordinary motives to that virtue, and reckless of such considerations as they cannot entirely escape. The usual allowance of spirits to ships' crews at a certain hour of the day, tends to create the appetite for spirits in its most imperious form. "Persons addicted to excessive drinking," says Paley, "suffer, in the intervals of sobriety, and near the return of their accustomed indulgence, a faintness and oppression *circa præcordia*, which it exceeds the ordinary patience of human nature to endure. This is usually relieved for a short time by a repetition of the same excess ; and to this relief, as to the removal of every long continued pain, they who have once experienced it, are urged almost beyond the power of resistance. *Pal. Phil. ch. 2, p. 314, 315, of the Philad. ed. of 1794.* Opposed to such an influence, neither the suggestions of religion nor the love of life, are of any avail.

An instance of insensibility to the latter, is mentioned by the late Dr. Rush, as occurring some years ago in Philadelphia. An habitual drunkard being strongly urged by one of his friends to leave off drinking, said: "Were a keg of rum in one corner of the room, and were a cannon constantly discharging balls between me and it, I could not refrain from passing before that cannon, in order to get at the rum." *Rush on the Diseases of the Mind, ch.* 10, *p.* 266 *of Philad. ed. of* 1812. Such kegs taken in the name of ship's stores, though for the avowed, and even the honest purpose of transportation as perquisites by the crew, would be quite sure even of a worse fate than that which, in the case at bar, appears to have attended the third keg before it left Liverpool. It is not very difficult to say what would have been the result of this captain's adventure in kegs, had the voyage proved prosperous. It ceased by the loss of the ship, when out a few days from Liverpool. Had it continued, I doubt the protection even of the king's seal. The temperance of the captain himself had, according to his own admission, been questioned ; and he had been obliged to clear himself by his certificate to the owners. He admits they desired him not to carry liquors. They told him insurance could not be got on account of his carrying spirits and being a drunkard. Certificates of his sobriety, procured both at Liverpool and St. John, were transmitted to New-York ; and these were followed by the representation in question: "the captain is a careful and *steady* man, has good officers and crew, and *no spirits allowed on board.*" In all human experience, I ask, what kind of compliance with such a representation are kegs of spirits for private adventure, with a captain already suspected of a drunkard's appetite ? But it is said they were not *intended for use.* In other transactions a man is holden to intend the natural consequences of his own act. If we allow this practice, every sailor may carry his regular supply of grog in the name of perquisite. The evasion would be worthy of the unlicensed grocer, whose trade is confined to the *biscuit,* but his *spirits* are uniformly given away. We are told that in this case, at least, the actual disallow-

ance of spirits, given in evidence and found by the jury, removed the legal imputation of collusion. Admitting that to be so, an isolated instance like the present, is not sufficient to warrant the law in allowing such a practice. Suppose the insurers to be told that no *spirits will be allowed ;* but there will be liberty for each sailor to carry kegs of liquor for sale on his private account; and, on being sued for a loss, you must run the risk of collecting from them whether they used any of it. Would an underwriter of ordinary sagacity consider the representation as worth a cent? It is like saying to a ship's crew, take what means of intoxication you please ; but be careful and not drink. In case of a representative or warranty of neutrality, it is not enough that the ship be in fact neutral. She must have the means of showing her neutrality ; such documents on board as shall vindicate the character she has assumed at the suit of the belligerent cruiser. 1 *Phil. on Ins.* 110. *Hughes on Ins.* 234, *Am. ed. of* 1833. It is no answer to say that she was in fact neutral. The reason is because by. gross negligence she has been left open to *probable* condemnation. The case at bar, and cases which must continually arise in ships represented or warranted to be temperate, should we allow the construction adopted by the court below, would be more than mere negligence. The officers and crew may introduce on board, at every port, the positive and certain means of drunkenness, eluding detection by appearances, by concealment, and a concerted system for the suppression or withholding of testimony. The result will be the leaving of temperance ships liable to become as miserably unseaworthy as any others ; more so, I venture to say, than those wherein grog is openly and regularly distributed.

It was, I take it, truly said on the argument, by the counsel for the plaintiffs in error, that, on showing the ship to have been lost through the actual intoxication of the captain, the action must have failed. But that they desired more ; to place beyond his reach the ordinary means of intoxication, and avoid the almost impracticable task of proving, by his own servants, a degree of ebriety and its conse-

Irwin v. Sea Ins. Co.

quences, which such men, even if they could be brought upon the stand, may be supposed not willing to disclose.

We are referred by the counsel for the defendant in error to several cases of misdescription in written applications for the obtaining of fire policies, and other regulations, which are, in general, regarded as standing on the same footing with the ordinary representation in marine policies. *Farm. Ins. and Loan Co.* v. *Snyder*, 16 *Wendell*, 481, 488. *Dobson* v. *Sotheby*, 1 *Mood. & Malk.* 90. *Delonguemere* v. *The Traders Ins. Co.*, 2 *Hall's R.* 589. *Langdon* v. *New York Equitable Fire Ins. Co.*, 2 *Hall's R.* 226. 6 *Wendell*, 623, *S. C. on error.* These authorities sustain actions upon fire policies notwithstanding certain variances in parts of the building in question, or in the character of the building itself, from the description on which the policies were founded; or notwithstanding the alleged appropriation of the building, or some part of it, to a more hazardous use than was allowed by certain clauses in the policy. The variances were holden either unsubstantial or not material to the risque, and the use alleged to be unwarrantably hazardous, was holden not to be within the prohibition of the policy. None of these cases apply to the one before us, unless it be denied that keeping intoxicating drinks on board a ship, is a circumstance in no way affecting her safety. I cannot bring myself to believe it so small a matter as the counsel for the defendant in error seemed to suppose, and as he seemed to think it is viewed by the shipping interest of the city of New-York. That it is looked upon as of some consequence at the insurance offices there, we derive from the testimony of the master who sailed the vessel in question.

On the whole, we think the court below erred in telling the jury, that, if the spirits were taken on board for cargo or transportation merely, no part being in fact used, the representation was substantially complied with. We think the charge should have been, that receiving the spirits, under the circumstances disclosed by the captain's testimony,

of itself falsified the representation, and nullified the policy. The cause was argued in this court by

*D. Lord, jun.,* for the plaintiff in error.

*A. G. Rogers,* for the defendants in error.

After advisement, the following opinion was delivered :—

By the CHANCELLOR. The objections to the charge of the judge as to the seaworthiness of the vessel, and as to the alleged misrepresentation as to its character or capacity to sustain the ordinary perils of the sea, were very properly abandoned by the counsel for the defendants in error as wholly untenable. The only question for consideration, therefore, is whether there was such a *misrepresentation* by the assured in relation to the character of his vessel as a temperance ship, as to deprive him of the benefit of his insurance; or rather whether the judge who tried the cause erred in the instructions which he gave to the jury on that subject. Upon this question I think the learned judge who delivered the opinion of the supreme court has, in the discharge of the arduous duties which are imposed upon the members of that court, entirely misapprehended a part of the testimony in the case, if he has not overlooked the distinction which exists between a representation and a warranty.

The representation was, that the master of the vessel was a careful and steady man, and that he had good officers and a good crew, and that no spirits were allowed on board. This, in the absence of any suspicion that the master or crew were so intemperate that they would be tempted to broach casks of liquor which were on board the ship, without any intention of having them used, is a simple *representation* that the vessel is intended to sustain the character of a temperance ship. In other words, that no ardent spirits were allowed on board *for the use of the officers or crew* during the voyage, or while laying in the port of lading or of discharge; that is, during the risk which the underwriters were asked to assume; and I doubt whether a more extended meaning should be given to these words, even in

a technical *warranty*. *See Whitehead* v. *Price,* 1 *Gale's R.* 151. 2 *Cr. Mees. & Rosc.* 447, *S. C.* But if the learned judge was right in supposing that previous to the underwriting of this policy, a strong suspicion existed on the part of the underwriters, that the master of the vessel was an intemperate man, so that he would be likely to get intoxicated if any ardent spirits were placed within his reach or under his control ; and that to guard against the risk of such an occurrence they required from the owner of the vessel an assurance that no ardent spirits would be allowed *to be carried in the vessel* during the voyage, a very different case would have been presented ; especially if the two kegs of liquor were taken on board by the master with the knowledge or assent of the assured, or, if the representation had been put in the form of a warranty. In such a case, proof that the liquor was merely transported in the ship from one port to the other, for the purpose of securing the benefit of the draw back as a perquisite of the master of the vessel, and that they were placed under the king's seal for that purpose, would not excuse the assured, or enable him to recover on his policy.

Upon a careful examination of the testimony, however, it will be seen that no suspicion existed as to the intemperance of the master until long after the loss of the ship ; and the certificates, which were called for by the defendants counsel, if they are evidence of any thing, show that no foundation for such a suspicion existed at the time they were given, for the purpose of enabling the assured to obtain payment of his loss from the underwriters. The representation was therefore true in the sense in which both parties must have understood it at the time it was made. The conclusion at which I have arrived is, that there was no error in the charge of the judge who tried this cause in the superior court of the city of New York ; and that no legal reason existed for reversing the judgment which that court rendered in favor of the present plaintiff in error.

The judgment of the supreme court should therefore be reversed, and the original judgment should be affirmed with costs to Irvin the plaintiff, in this court, and also upon the

writ of error in the supreme court; together with interest on his original judgment by way of damages for the delay caused by that writ of error.

On the question being put, *Shall this judgment be reversed?* all the members of the court present, who had heard the argument, answered unanimously in the *affirmative.* Whereupon the judgment of the supreme court was *reversed,* and the judgment of the superior court of the city of New York AFFIRMED.